Slip Op. 09-81

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| FUJIAN LIANFU FORESTRY CO., LTD., A.K.A. FUJIAN WONDER PACIFIC INC., FUZHOU HUAN MEI FURNITURE CO., LTD., AND JIANGSU DARE FURNITURE CO., LTD., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Before: Leo M. Gordon, Judge <br><br> Consol. Court No. 07-00306 |

### OPINION AND ORDER

[Commerce's final administrative review results remanded.]

Dated: August 10, 2009

Arent Fox (Nancy A. Noonan, Matthew L. Kanna) for Plaintiffs Fujian Lianfu Forestry Co., Ltd., a.k.a. Fujian Wonder Pacific Inc., Fuzhou Huan Mei Furniture Co., Ltd., and Jiangsu Dare Furniture Co., Ltd.

Steptoe & Johnson (Thomas J. Trendl, Jamie B. Beaber) for Plaintiffs Starcorp Furniture Co., Ltd., Starcorp Furniture (Shanghai) Co., Ltd., Orin Furniture (Shanghai) Co., Ltd., Shanghai Star Furniture Co. Ltd., and Shanghai Xing Ding Furniture Industrial Co., Ltd.

Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Brian A. Mizoguchi), Senior Trial Attorney; and Office of Chief Counsel for Import Administration, U.S. Department of Commerce (Rachel Wenthold), of counsel, for Defendant United States.

King & Spalding LLP (J. Michael Taylor, Elizabeth E. Duall, Jeffrey M. Telep, Joseph W. Dorn, Stephen A. Jones) for Defendant-Intervenor American Furniture Manufacturers Committee for Legal Trade.

Gordon, Judge: This consolidated action arises from the first administrative review of the antidumping duty order ("Order") covering wooden bedroom furniture from

the People's Republic of China ("PRC").  See Amended Final Results of Antidumping Duty Administrative Review and New Shipper Reviews: Wooden Bedroom Furniture From the People's Republic of China, 72 Fed. Reg. 46,957 (Dep't Commerce Aug. 22, 2007), as amended, 72 Fed. Reg. 62,834 (Dep't Commerce Nov. 7, 2007) (amended final results admin. review) ("Final Results"); see also Issues and Decision Memorandum for the 2004-2005 Administrative Review of Wooden Bedroom Furniture from the People's Republic of China, A-570-890 (Aug. 8, 2007), available at http://ia.ita.doc.gov/frn/summary/prc/E7-16584-1.pdf (last visited Aug. 10, 2009) ("Issues and Dec. Mem."); Memorandum from Wendy J. Frankel, Director, AD/CVD Enforcement, Office 8, to Stephen J. Claeys, Deputy Assistant Secretary for Import Administration (Aug. 8, 2007) (Application of Adverse Facts Available to Starcorp) ("Starcorp AFA Mem.").

Respondents, (1) Fujian Lianfu Forestry Co., Ltd., a.k.a. Fujian Wonder Pacific Inc., Fuzhou Huan Mei Furniture Co., Ltd., and Jiangsu Dare Furniture Co., Ltd., ("Dare Group"); and (2) Starcorp Furniture Co., Ltd., Starcorp Furniture (Shanghai) Co., Ltd., Orin Furniture (Shanghai) Co., Ltd., Shanghai Star Furniture Co., Ltd., and Shanghai Xing Ding Furniture Industrial Co., Ltd., ("Starcorp"); and Petitioners, American Furniture Manufacturers Committee For Legal Trade ("AFMC"), each move for judgment on the agency record pursuant to USCIT Rule 56.2, challenging the Final Results.  The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as

amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[1] and 28 U.S.C. § 1581(c) (2000). For the reasons set forth below, the court remands this action to Commerce to reconsider (1) its decision regarding combination rates, and (2) its selection of a total adverse facts available rate of 216.01 percent for Starcorp. The court sustains Commerce's determinations regarding all other issues in this action.

## I. Standard of Review

When reviewing the U.S. Department of Commerce's ("Commerce") final results of an antidumping duty administrative review under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), the U.S. Court of International Trade sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

"Substantial evidence" is a word formula that connotes reasonableness review. When reviewing a party's substantial evidence challenge, the court assesses whether the agency "determination, finding, or conclusion" is reasonable given the record as a whole. See Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006); 3 Charles H. Koch, Jr., Administrative Law and Practice § 10.3[1] (2d ed. 2008). When reviewing substantial evidence issues from non-market economy proceedings involving Commerce's selection of the "best available" pricing and cost data taken from "surrogate" economies/companies, 19 U.S.C. § 1677b(c), the court's role "is not to

---

[1] Further citations to the Tariff Act of 1930 are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." <u>Goldlink Indus. Co. v. United States</u>, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006) ("<u>Goldlink</u>"); <u>see also</u> <u>Dorbest Ltd. v. United States</u>, 30 CIT 1671, 1675-76, 462 F. Supp. 2d 1262, 1269-70 (2006) ("<u>Dorbest</u>") (providing comprehensive explanation of substantial evidence standard of review in non-market economy context).

Separately, the two-step framework provided in <u>Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. <u>Dupont Teijin Films USA, LP v. United States</u>, 407 F.3d 1211, 1215 (Fed. Cir. 2005). "[S]tatutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under <u>Chevron</u>." <u>Pesquera Mares Australes Ltda. v. United States</u>, 266 F.3d 1372, 1382 (Fed. Cir. 2001).

## II. Discussion

### A. Combination Rates

AFMC challenges Commerce's decision not to assign combination rates[2] to exporters pursuant to 19 C.F.R. § 351.107(b) (2004).[3] Commerce concedes that it did not explain its decision regarding combination rates. Commerce therefore requests a remand to reexamine the record, provide a reasoned explanation, and take any

---

[2] When merchandise is exported to the United States by a company that is not a producer of the merchandise, Commerce may establish a "combination rate" for each combination of the exporter and its supplying producer(s). 19 C.F.R. § 351.107(b).

[3] Further citations to the C.F.R. are to the 2004 edition.

appropriate action consistent with the remand analysis.  Accordingly, the court will grant the remand request.  See SKF USA Inc. v. United States, 254 F.3d 1022, 1029 (Fed. Cir. 2001).

### B. Selection of Total Adverse Facts Available Rate for Starcorp[4]

In the Final Results, after concluding that Starcorp had not cooperated to the best of its ability (an issue the court addresses in Section C), Commerce assigned a total adverse facts available ("AFA") rate of 216.01 percent to Starcorp.  See Issues and Dec. Mem., Pub. Doc. 1185 fr. 222.[5]  In a total AFA scenario, Commerce is unable to calculate an antidumping rate for an uncooperative respondent because the information required for such a calculation (the respondent's sales and cost information for the subject merchandise during the period of review) is found to be unreliable.  As a substitute, Commerce relies on the petition, the final determination from the investigation, prior administrative reviews, or other information placed on the record, 19 U.S.C. § 1677e(b), to select a proxy that should be a "reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent

---

[4] Defendant argues that Starcorp failed to contest the lawfulness of the total AFA rate at the administrative level.  According to Defendant, the 216.01 percent rate was applied in the Preliminary Results to certain of Starcorp's sales, and was applied to other respondents, as adverse facts available, requiring Starcorp to contest the rate in its case brief.  The court does not agree.  Had Commerce applied the total AFA 216.01 percent rate to Starcorp in the Preliminary Results, then Starcorp would have had to have contested the rate at the administrative level.  Commerce though did not apply the 216.01 percent rate as a total AFA rate until the Final Results.  Also, Starcorp did respond to the propriety of the 216.01 percent rate as a total AFA proxy in its rebuttal brief to petitioners' case brief.

[5] Documents in the administrative record are identified as either "Pub. Doc." (for a public document) or "Confid. Doc." (for a confidential document), followed by the document and CD-ROM frame numbers.

to noncompliance." F.LLI De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("De Cecco").

When applying a total AFA rate, Commerce shall, "to the extent practicable," corroborate that rate "from independent sources that are reasonably at [its] disposal." 19 U.S.C. § 1677e(c). The statute does not prescribe any methodology for corroborating a total facts available rate, but the regulations state that corroborate "means that the Secretary will examine whether the secondary information to be used has probative value." 19 C.F.R. § 351.308(d) (parroting Uruguay Round Agreements Act Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1 at 870 (1994), reprinted in 1994 U.S.C.C.A.N. 3773, 4199). A total facts available proxy rate should therefore have probative value of a "reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance." De Cecco, 216 F.3d at 1032. As a general matter, Commerce assesses the probative value of secondary information by examining its reliability and relevance. See Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom, 70 Fed. Reg. 54,711, 54,712-13 (Sept. 16, 2005) (final results). For specific secondary information like a total facts available proxy, the corroboration analysis therefore depends on whether the proxy is a reliable and relevant indicator that satisfies the De Cecco standard.

What this means is that the total AFA rate should bear a "rational relationship to the respondent, not just the industry on the whole." Tianjin Mach. Imp. & Exp. Corp. v. United States, 31 CIT ___, ___, Slip Op. 07-131 at 35 (Aug. 28, 2007) (citing Shandong

Huarong Gen. Group Corp., 31 CIT ___, ___, Slip Op. 07-04 at 7 (Jan. 9, 2007) ("[T]he law 'requires that an assigned rate relate to the company to which it is assigned.'") (internal citation omitted)). Courts "have affirmed Commerce's selection of adverse facts available margins where Commerce corroborated the margin with respect to a respondent's own transaction specific margins, either from the period of review at issue, . . . , or a previous period of review." PAM, S.p.A. v. United States, 31 CIT ___, ___ 495 F. Supp. 2d 1360, 1372 (2007) ("PAM") (citing Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1339-40 (Fed. Cir. 2002) and Mittal Steel Galati S.A. v. United States, 31 CIT ___, ___, 491 F. Supp. 2d 1273, 1276 (2007)). Similarly, this Court has found that "Commerce adequately corroborated where it compared the adverse facts available margin selected to the highest previously calculated margin for that respondent." PAM, 31 CIT at ___, 495 F. Supp. 2d at 1372 (citations omitted). Conversely, "the courts have remanded for lack of corroboration of adverse facts available rates where Commerce did not establish a link between the respondent and the rate selected." Id. at ___, 495 F. Supp. 2d at 1372 (citing, e.g., De Cecco, 216 F.3d at 1032; Gerber Food (Yunnan) Co. v. United States, 31 CIT___, ___, 491 F. Supp. 2d 1326, 1352 (2007) ("Gerber Food"); World Finer Foods, Inc. v. United States, 24 CIT 541, 547-48 (2000); Ferro Union, Inc. v. United States, 23 CIT 178, 44 F. Supp. 2d 1310 (1999)).

During the administrative review Commerce provided the following rationale for its selection and attempted corroboration of the 216.01 percent rate:

> Generally, it is the Department's practice to select, as AFA, the highest rate in any segment of the proceeding. See, e.g., Certain Cased Pencils

from the People's Republic of China; Notice of Preliminary Results of Antidumping Duty Administrative Review and Intent to Rescind in Part, 70 FR 76,755, 76,761 (December 28, 2005).

The Court of International Trade ("CIT") and the Court of Appeals for the Federal Circuit ("Fed. Cir.") have consistently upheld the Department's practice. See Rhone Poulenc, Inc. v. United States, 899 F. 2d 1185, 1190 (Fed. Cir. 1990) ("Rhone Poulenc") (upholding the Department's presumption that the highest margin was the best information of current margins); . . . .

Corroboration

. . .

The AFA rate that [Commerce] is now using was determined in the recently published new shipper review. See Final New Shipper Review 71 FR 70741. In the new shipper review, [Commerce] calculated a company-specific rate, which was above the PRC-wide rate established in the LTFV investigation. Because this new rate is a company-specific calculated rate, we have determined this rate to be reliable.

To assess the relevancy of the new rate used, [Commerce] examined the highest rate from the recently completed new shipper review. We find that the highest rate from the new shipper proceeding of 216.01 percent is relevant to this proceeding because: (1) it is a company-specific calculated rate; and (2) the new shipper review period overlaps this administrative review period by twelve months (i.e., June 24, 2004, through June 30, 2005). Therefore, we have determined the 216.01 percent rate to be relevant for use in this administrative review.

As the adverse margin is both reliable and relevant, we determine that it has probative value. Accordingly, we determine that this rate, meets the corroboration criteria established in section 776(c) that secondary information have probative value. As a result, [Commerce] determines that the margin is corroborated for the purposes of this administrative review and may reasonably be applied to First Wood, Huanghouse, Starcorp, and the PRC-wide entity as AFA.

Preliminary Results, 72 Fed. Reg. at 6213-17; see also Final Results, 72 Fed. Reg. at

62,834.

The court cannot sustain this determination because Commerce's attempted corroboration never explains whether the selected proxy is a reliable and relevant indicator of a "reasonably accurate estimate of [Starcorp's] actual rate, albeit with some built-in increase intended as a deterrent to noncompliance." De Cecco, 216 F.3d at 1032.  In short Commerce never ties the rate to Starcorp.  In making its selection, Commerce relied on Rhone Poulenc, 899 F.2d at 1190, and chose the highest calculated rate from any segment of the proceeding.  Rhone Poulenc involved Commerce's interpretation and application of the antidumping law's "best information available" or "BIA" provision that was replaced in 1994 by the "facts available" provision at issue here.  Under the old law, when Commerce applied total BIA to a respondent, Commerce applied the highest rate in any segment of the proceeding, presuming that "the highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, knowing of the rule, would have produced current information showing the margin to be less."  Id. at 1190 (emphasis in original).  The old law, however, did not have a corroboration requirement, a difference that the Court of Appeals for the Federal Circuit explained in De Cecco:

> It is clear from Congress's imposition of the corroboration requirement in 19 U.S.C. § 1677e(c) that it intended for an adverse facts available rate to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance. Congress could not have intended for Commerce's discretion to include the ability to select unreasonably high rates with no relationship to the respondent's actual dumping margin. Obviously a higher adverse margin creates a stronger deterrent, but Congress tempered deterrent value with the corroboration requirement. It could only have done so to prevent the petition rate (or other adverse inference rate), when unreasonable, from prevailing and to block any temptation by Commerce to overreach reality in seeking to maximize deterrence.

De Cecco, 216 F.3d at 1032.  Commerce may, of course, begin its total AFA selection process by defaulting to the highest rate in any segment of the proceeding, but that selection must then be corroborated, to the extent practicable.  To corroborate, Commerce needs to demonstrate how the selected proxy satisfies the De Cecco standard.

Commerce's corroboration attempt here did not explain how the selected total AFA rate bears a rational relationship to Starcorp.  Commerce's conclusion that the total AFA rate is reliable because it is "a company-specific calculated rate," does not tie the rate to Starcorp.  Preliminary Results, 72 Fed. Reg. at 6217.  Commerce's other conclusion, that the total AFA rate is relevant because it was calculated during a new shipper review that overlapped with the administrative review, is similarly unhelpful in indentifying how the selected rate relates to Starcorp.  Id.  Commerce never ties its selected total AFA rate to Starcorp, and the court never learns whether the proxy meets the De Cecco standard.

Starcorp received a calculated rate of 15.78 percent in the investigation.  See Wooden Bedroom Furniture From the People's Republic of China, 70 Fed. Reg. 329 (Dep't Commerce Jan. 4, 2005) (final determination).  Commerce's assignment of a 216.01 percent rate as a total AFA rate, based on some other respondent having received that same rate in a contemporaneous new shipper review, appears to be a potentially "unreasonably high rate[] with no relationship to the respondent's actual dumping margin."  De Cecco, 216 F.3d at 1032.  Therefore, the court must remand this issue to Commerce to reconsider its selection of a total AFA rate for Starcorp.

Commerce needs to address the corroboration standards articulated by the Court of Appeals for the Federal Circuit in De Cecco.  If it is not "practicable" under 19 U.S.C. § 1677e(c) to tie a total AFA proxy to Starcorp, then Commerce needs to explain why. The court is not rejecting the notion that the 216.01 percent rate may be an appropriate total AFA proxy for Starcorp, but to sustain such a rate the court needs a reasonable explanation from Commerce as to why that rate represents a "reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance."  De Cecco, 216 F.3d at 1032.

### C. Application of Adverse Inference to Starcorp

If Commerce finds that a respondent's information is unreliable because the respondent has withheld information that Commerce requests, failed to provide requested information in a timely manner or in the form or manner requested, or significantly impeded the progress of the proceeding, Commerce is required to calculate that respondent's margin using the facts otherwise available.  19 U.S.C. § 1677e(a)(2). Commerce may draw an adverse inference against a respondent in selecting from among the facts otherwise available when it finds that a respondent "has failed to cooperate by not acting to the best of its ability."  19 U.S.C. § 1677e(b).

Prior to applying an adverse inference Commerce examines a respondent's actions and assesses the extent of the "respondent's abilities, efforts, and cooperation in responding to Commerce's information requests."  Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  "Acting to the best of its ability" requires that a respondent do the maximum that it is able to do.  Id.  Although the standard does

not require perfection and recognizes that mistakes occur, it does not condone inattentiveness, carelessness, or inadequate record-keeping.  Id.  Rather, it is the responsibility of a respondent to comply with Commerce's information requests.

Whether a respondent has done the maximum it was able to do to comply with Commerce's requests involves both objective and subjective inquiries.  First, Commerce must make "an objective showing that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations."  Id. at 1382-83.  Second, Commerce must make a subjective showing that the respondent not only has failed to promptly produce the requested information, "but further that the failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records."  Id.

Commerce found that because Starcorp withheld and failed repeatedly to timely produce requested data, in the form and manner requested, the record lacked sufficient reliable data with which to analyze and calculate an antidumping duty for Starcorp. Specifically, Commerce determined, in accordance with § 1677e(a)(2), that the use of facts otherwise available was warranted because Starcorp: (1) misreported and withheld information regarding 56 percent of its U.S. sales; (2) failed to provide its factors of production databases in the form and manner requested and within Commerce's established deadlines; (3) withheld reliable financial statements; and (4) provided data that contained numerous other unexplained discrepancies.

Having determined that Starcorp's information was unreliable, Commerce then found that Starcorp failed to cooperate to the best of its ability. Specifically, Commerce found that Starcorp had not acted as a reasonable respondent because its repeated failure to comply with requests for information was unnecessary. In addition, Commerce found that Starcorp concealed its true reporting methodology and selectively reported information by "providing only that information that [Starcorp] deemed relevant and appropriate . . . and withholding, or providing in an untimely and confusing manner, information specifically requested by [Commerce]." Starcorp AFA Mem., Pub. Doc. 1184 fr. 43. As a result, pursuant to 19 U.S.C. § 1677e(b), Commerce concluded that, when selecting from the facts otherwise available for the calculation of Starcorp's margin, an adverse inference was warranted.

Starcorp challenges Commerce's application of an adverse inference to the facts otherwise available in the calculation of Starcorp's dumping margin. Starcorp argues that it went to "extraordinary lengths," and did "everything possible," or "the maximum it was able to do" to cooperate with Commerce, i.e., to meet Commerce's requests for information. Starcorp Mem. in Support of Mot. J. Agency R. 17, 16, 20 ("Starcorp Br."). Starcorp further contends that Commerce caused any gaps in the record because it demanded information in a form and manner not consistent with how Starcorp keeps its books and records, so that an adverse inference should not apply. Starcorp is not challenging Commerce's reliability determination – that the use of facts otherwise available was warranted pursuant to 19 U.S.C. § 1677e(a)(2)(A), (B), and (C). However, to the extent that any findings under § 1677e(a)(2)(A), (B), and (C) also

support Commerce's determination to apply an adverse inference, those findings are part of Starcorp's challenge.  Starcorp requests a remand to Commerce to apply facts otherwise available without the application of an adverse inference.  Starcorp Br. 16, 50.

As is evident from the record leading to Commerce's decision to apply facts otherwise available, Starcorp did not make timely or maximum efforts to comply with Commerce's requests for information, failed to disclose available facts and information, and was not cooperative.  Accordingly, Commerce's finding that an adverse inference was warranted in the calculation of Starcorp's dumping margin, because Starcorp did not cooperate to the best of its ability, is supported by the record as a whole and is thus reasonable.

### 1.  Starcorp's Failures as to its U.S. Sales Data

Commerce determined that Starcorp's failure to report sold but not produced merchandise and its failure to disclose its reporting methodology with respect to such merchandise, until very late in the proceeding, significantly impeded Commerce's ability to comprehend and analyze Starcorp's reported data within the statutory time frame.  As a result of this failure, Commerce lacked reliable information from which to calculate a margin, pursuant to 19 U.S.C. § 1677e(a)(2)(A), (B), and (C), for a sizable portion of Starcorp's U.S. sales. Starcorp AFA Mem. at 4-15; Issues and Dec. Mem. at 219-20. Starcorp's failure, in turn, lead Commerce to conclude that Starcorp did not act to the best of its ability to provide Commerce with the requested information.  Starcorp AFA Mem. at 8.

Starcorp disagrees with Commerce's conclusions and version of the facts. Starcorp Br. 17. Starcorp maintains that it made its maximum effort to comply with Commerce's requests for data on its U.S. sales.

Commerce's initial questionnaire, issued in July 2006, inquired whether Starcorp had sold but not produced merchandise and instructed respondents to contact Commerce prior to preparing their response if they had such products. Starcorp AFA Mem. at 5. Starcorp responded that it had "produced <u>all</u> merchandise under consideration that it sold." Starcorp Section D Resp. at D-3 (Oct. 2, 2006), Pub. Doc. 553 fr. 10 (emphasis added). That statement was not true. After a later inquiry by Commerce about two items that had been described as "unfinished" — Starcorp acknowledged that those two items were sold but not produced during the period. Starcorp Supplemental Section C Questionnaire Resp. at 10 (Dec. 12, 2006), Confid. Doc. 283 fr. 17. This sold but not produced merchandise accounted for 56 percent of Starcorp's U.S. sales. At that point, however, Starcorp still failed to disclose the full extent to which its reporting was affected by sold but not produced merchandise, including in particular its use of proxy data rather than actual data for the factors of production ("FOPs") for the sold merchandise. Starcorp AFA Mem. at 4, 14-15.

Starcorp thus reported sales quantities rather than actual production quantities, <u>id.</u> at 4-8, and devised a method of approximating production data for the items that it did not produce, <u>id.</u> at 8-13. It was only through follow-up questionnaires that Commerce discovered that Starcorp had devised its own reporting methodology to

substitute proxy data for actual production data, without prior disclosure to or approval by Commerce. See id. at 4-13; see also Issues and Dec. Mem. at 186-87, 219-20.

Without first informing Commerce, in contravention of Commerce's instructions, Starcorp failed to disclose several other deviations from reporting actual production data. Starcorp AFA Mem. at 5 (listing additional failures to disclose). To illustrate, Starcorp assigned to its sold but not produced merchandise FOPs that were not actual production data. Id. Specifically, Starcorp assigned FOPs to that merchandise based upon products that Starcorp had deemed most resembled the items that it had not produced. Id.

Commerce concluded that Starcorp had "misled" the agency "by 1) stating that it had reported production quantities for all products when in fact it had not, and 2) by not providing any indication that it had merchandise that it had sold and not produced for which it was not reporting actual FOPs." Id. at 6 (emphasis in original).

Commerce reasoned that "if Starcorp's failure to disclose sold but not produced merchandise in its first questionnaire had been an oversight . . . [Commerce's] supplemental questionnaire . . . should have alerted Starcorp to the problem . . . ." Id. at 8. Commerce concluded that Starcorp was "at best, careless or inattentive in preparing its questionnaire responses, and therefore, did not act to the best of its ability to comply with [Commerce's] requests." Id.

By withholding and not timely disclosing its sold but not produced items, or its reporting methodology for these items, Commerce found that Starcorp had deprived it of the opportunity to conduct a meaningful analysis of Starcorp's methodology and further

precluded any opportunity for Commerce to consider what might have been the most appropriate method for calculating Starcorp's factors of production for merchandise for which actual production data was unavailable.  See Issues and Dec. Mem. at 219-220.

Given that Starcorp, not Commerce, was the party in control of Starcorp's information, it was incumbent upon Starcorp to fully and clearly disclose to Commerce, on a timely basis, the merchandise that it had not produced, and its reporting of proxy rather than actual production data.  This is especially true given the large percentage of Starcorp's U.S. sales affected by the non-disclosure.

A respondent has "a statutory obligation to prepare an accurate and complete record in response to questions plainly asked by Commerce." Tung Mung Dev. Co. v. United States, 25 CIT 752, 758 (2001).  A respondent also is obligated to fully disclose all requested information, and cannot select which facts, from the range of information requested, it will report to Commerce.  See NTN Corp. v. United States, 28 CIT 108, 117, 120, 306 F. Supp. 2d 1319, 1329, 1332 (2004).  Here Commerce's initial and subsequent questionnaires were clear.  Moreover, Commerce complied with its obligations under § 1677m(d) by requesting that Starcorp report all its factors of production, including those for merchandise it did not produce, and by continuing to request more detailed information in not just one, but several supplemental questionnaires.  19 U.S.C. § 1677m(d).

As detailed in its 44-page memorandum, Commerce expended considerable time and resources attempting to extract information from Starcorp through the issuance of numerous questionnaires.  Starcorp was uncooperative and failed to timely comply with

Commerce's requests.  See Starcorp AFA Mem. at 43; Issues and Dec. Mem. at 180-

83, 185-89, 219-21.  Specifically, Commerce found that Starcorp failed to disclose the

existence of sold but not produced merchandise and did not explain its true reporting

methodology (e.g., use of proxy FOP data and sales quantities instead of production

quantities) until late in the proceeding, thereby withholding and selectively reporting

information that specifically had been requested by Commerce.  See Starcorp AFA

Mem. at 41; Issues and Dec. Mem. at 173-190, 204-222; Final Results, 72 Fed. Reg. at

46,962-63.  Ultimately, Commerce concluded that the facts demonstrated that Starcorp

had not acted as a reasonable respondent.  Starcorp AFA Mem. at 15.

Commerce's determination that Starcorp failed to make maximum efforts

necessary to provide Commerce with the requested information is therefore reasonable

given the record as a whole.  See Tianjin Mach. Imp. & Exp. Corp., 31 CIT at ___, Slip

Op. 07-131 (respondent's misrepresentation of true nature of agency relationship

warranted application of adverse facts available); see also Gerber Food, 31 CIT at ___,

491 F. Supp. 2d at 1334-54 (misrepresenting the nature of 24 transactions warranted

the application of adverse facts available).

### 2.  Starcorp's Failures as to its Factors of Production Databases

Commerce also found that Starcorp failed to cooperate to the best of its ability

because it failed to submit reliable factors of production databases.  See Starcorp AFA

Mem. at 15-30; Issues and Dec. Mem. at 178-222.  Starcorp appears to suggest that

Commerce's finding that Starcorp had failed to timely disclose the actual facts regarding

56 percent of Starcorp's U.S. sales resulted "because Commerce chose to use the very

FOP files which Starcorp informed Commerce were inconsistent with how it operated and kept its books and records in the normal course of business, and thus were of limited accuracy." Starcorp Br. 16. Starcorp also suggests that Commerce is to blame for Starcorp's reporting failures because Commerce insisted upon plant-specific data. Starcorp did not provide plant-specific information until near the end of the review process.

Starcorp argues that because it does not keep plant-specific information in the normal course, Commerce should not have required it to submit its data on a plant-specific basis, and that Commerce failed "to take into account [that] Starcorp went to extraordinary lengths to provide Commerce with the requested information. . . ." Starcorp Br. 17. The record, however, supports Commerce's conclusion that Starcorp repeatedly failed to comply with Commerce's requests for plant-specific information, and did not provide Commerce with an adequate explanation as to why Starcorp's combined database, which it claimed to use in the normal course of business, would provide more accurate factor usage information. The record does not support Starcorp's contention that supplying plant-specific databases for factors of production was unduly burdensome for Starcorp.

Commerce's difficulties in obtaining plant-specific FOP databases from Starcorp, and Starcorp's ability to provide such information, were recorded in detail by Commerce. See Starcorp AFA Mem. at 15-30; Issues and Dec. Mem. at 178-82. In short, Commerce explained to Starcorp that, in accordance with standard practice, to adequately capture its factor usage information, Commerce needed Starcorp to report

its production data from each of its four operating plants. Commerce requested that Starcorp disclose factors of production on a plant-specific basis because plant-specific reporting more accurately captures the differences in production efficiencies at each plant. See Issues and Dec. Mem. at 178. Commerce twice sought this information from Starcorp.

Starcorp requested two extensions of time, which were granted in part, but Commerce found Starcorp did not produce the requested plant-specific data. Instead, Starcorp urged acceptance of combined FOP data and a combined financial statement. Starcorp Supplemental Section D Resp. (Nov. 29, 2006), Confid. Doc. 255 fr. 10. On January 8, 2007, several months after Commerce's initial request, and just 23 days before Commerce's statutory deadline for issuance of Commerce's preliminary results, Starcorp finally produced plant-specific databases. See Starcorp AFA Mem. at 19-20; Starcorp Supplemental Section D Questionnaire Resp. at 3-4 (Jan. 8, 2007), Confid. Doc. 347 frs. 11-12. However, the plant-specific databases that Starcorp finally produced contained several unreconciled discrepancies, and were submitted without adequate explanation that would permit Commerce to determine their reliability. See Starcorp AFA Mem. at 21-22; Issues and Dec. Mem. at 182, 220. Commerce found that Starcorp's delay in providing plant-specific information deprived Commerce of the opportunity to resolve the evident discrepancies in Starcorp's information. See Starcorp AFA Mem. at 21.[6]

---

[6] "[H]ad Starcorp submitted and described these databases in October 2006, as originally requested by [Commerce], or even in November 2006, as subsequently requested . . . , there would have been an opportunity to analyze them and issue

Commerce's inability to solicit and consider additional information much past the issuance of its <u>Preliminary Results</u> was explained on the record, when Commerce similarly responded to another party's late requests for Commerce to consider new factual information.  Issues and Dec. Mem. at 135.[7]

Because Starcorp's plant-specific data were submitted so late in the proceeding, Commerce was never able to attain a complete understanding of Starcorp's submitted information or its reporting methodologies.   Commerce was, therefore, unable to determine based on the record evidence which if any of the databases Starcorp

---

supplemental questionnaires soliciting information to clarify or rectify, as appropriate, these inconsistencies. . . . [Because Starcorp] . . . withheld these data until just before the <u>Preliminary Results</u>, [Commerce] was again deprived of the opportunity to seek . . . clarification or corrections. . . . ."   Starcorp AFA Mem. at 21; <u>see also</u> Issues and Dec. Mem. at 182 ("Had Starcorp been more forthcoming in its earlier questionnaire responses and had it responded to [Commerce]'s requests for data in a timely fashion (<u>i.e.</u>, in response to the questionnaires soliciting that data), [Commerce] may have had the opportunity to review the information in detail prior to the verification and may have been able to resolve with Starcorp which database represented the most accurate reflection of its factor consumption ratios for its U.S. sales.").

[7] "[Commerce] must set a date certain to close the administrative record in order to meet its obligations for completing any segment of a proceeding.  Such deadlines are established to allow [Commerce] sufficient time to analyze the information and facilitate [Commerce's] ability to administer the antidumping law.   . . . Upon return from verification, the team had to write verification reports.  Following the release of the verification reports, the team had literally hundreds of pages of case and rebuttal briefs to analyze and which to respond.   Additionally, based on positions adopted by [Commerce] in response to the arguments in the briefs, the team had to make changes to its margin programs, research new surrogate value information, draft a final factors-of-production memorandum, company-specific analysis memorandums {sic} and the Final Results <u>Federal Register</u> notice, and accomplish many other tasks normally associated with finalizing an antidumping case.  The ability to set a date certain to close the record is crucial to allow [Commerce] to perform these tasks.  To allow respondents to provide any factual information they please at any time would make the administration of the case within the statutory deadlines literally impossible."  Issues and Dec. Mem. at 135.

submitted were suitable for use in calculating Starcorp's margin.  <u>See</u> Issues and Dec. Mem. at 182.  On the one hand, Commerce found Starcorp's combined database not to be reliable because it does "not capture varying plant-specific production efficiencies . . . ."  <u>Id.</u> at 181.  Commerce also found that Starcorp's contention that its combined database was more accurate because Starcorp purportedly operates as a single facility, Starcorp Br. 18, was not supported by record evidence.  Issues and Dec. Mem. at 180 ("[W]e have determined that Starcorp's contentions that the company-wide combined FOP data are necessarily more accurate than the plant-specific FOP data are not supported by record evidence.  For example, there appears to be no direct correlation between which legal entity purchases the raw material and which factory actually consumes it, as Starcorp alleges.  It is further unclear how this fact would impact the accuracy of the plant-specific but not the combined FOP databases.").  On the other hand, with respect to Starcorp's plant-specific databases Commerce found that it was "not able to assess how accurately the variances are captured because Starcorp did not adequately reconcile its combined FOP database to its plant-specific FOP databases." Issues and Dec. Mem. at 182.

Starcorp does not appear to dispute Commerce's finding that there were discrepancies in Starcorp's plant-specific data, but instead blames their existence upon Commerce's requirement that Starcorp report information on a plant-specific basis. Starcorp Br. 19 ("This is particularly true where those consequences (<u>i.e.</u>, the potential for inaccuracies or inadvertent omissions in the data) eventually came to pass, at least in part.").  Starcorp also reiterates its contentions before Commerce that reporting on a

plant-specific basis was unduly burdensome and that Starcorp acted to the best of its ability to report factors of production data.  Starcorp Br. 18-20.

Commerce examined below the arguments that Starcorp advances here in its brief, and found that the record did not support Starcorp's contentions.  See Starcorp AFA Mem. at 23-28; Issues and Dec. Mem. at 180-81.  To illustrate, Commerce found that, because Starcorp maintained its production and inventory data in Excel files that track data by plant, Starcorp simply needed to aggregate the data by plant, rather than company-wide and complete the calculations already completed for its combined FOP database on the plant-specific bases.  Issues and Dec. Mem. at 181.[8]  Commerce further considered that Starcorp's verification revealed that Starcorp had the ability to report FOP data on a plant-specific basis because it collected gross raw material consumption data on a plant-specific basis.  Id.  Commerce concluded, based upon these and other observations, including its examination of Starcorp's books and

---

[8] "First, with respect to the items that Starcorp already tracks on a model-specific basis, the reporting methodology should be the same regardless of whether Starcorp is reporting on a combined- or plant-specific basis.   Second, with respect to the allocations involving net consumption, Starcorp itself stated that the total model-specific production quantities and the respective BOMs {bill of materials} for each product served as the basis for this calculation.  This was, in fact, how it derived the net BOM consumption values for total production.  Starcorp also explained at verification that it maintained a production report identifying each piece of merchandise produced, by production plant.  From these data, Starcorp compiled the quantities produced for purposes of its combined FOPs on a corporate-wide basis.  However, since the production and inventory data are maintained in Excel files that track the data by plant, all Starcorp would have had to {have} done differently was to aggregate the data by plant, rather than company wide and complete the calculations already completed for its combined FOP database on the plant-specific bases.  Especially since, as Starcorp stated, regardless of which plant produces the product, the BOM is the same.   This does not appear to be so extraordinarily difficult given that the data is maintained in an Excel file, as is Starcorp [sic] own data." Issues and Dec. Mem. at 181.

records, and discussions with Starcorp personnel, that Starcorp could have timely complied with Commerce's request for plant-specific data because, among other things, Starcorp recorded such data in the ordinary course of business.  Id. (citing Starcorp Verification Report at 16); see Starcorp AFA Mem. at 27-28.

It was Starcorp's repeated and multiple failures to disclose, not Commerce's preference for plant-specific information, that caused Commerce only belatedly to discover Starcorp's use of other than actual production data for these sales.  Commerce also found Starcorp similarly uncooperative with respect to other requests for information.  With respect to its requests for plant-specific FOP data, Commerce found that Starcorp's data, when ultimately produced, was plagued by discrepancies and distortions.  Starcorp AFA Mem. at 28-30.  Commerce also found that Starcorp failed to cooperate to the best of its ability because it "failed to provide forthcoming responses in a timely manner, despite [Commerce's] numerous direct requests to do so, and this failure significantly impeded [Commerce's] ability to comprehend and analyze Starcorp's data adequately within the statutory timeframe."  Id. at 29.  When Starcorp eventually did provide some of the requested plant-specific FOP data, "it did so without adequate explanation," such that Commerce could not sufficiently comprehend that data submitted.  Issues and Dec. Mem. at 220.

If a respondent requests a review, it should possess complete and accurate records of its factors of production.  See Tianjin Mach. Imp. & Exp. Corp. v. United States, 28 CIT 1635, 1637, 353 F. Supp. 2d 1294, 1299 (2004).  In this case, Starcorp requested that it be reviewed, and had participated in the previous segment

(the underlying investigation).  Starcorp does not have a credible basis to suggest that it was surprised by Commerce's requests for factors of production data.  Commerce thus reasonably concluded that "because it is apparent from the facts on the record that Starcorp's failure to be responsive was unnecessary, we find that with respect to its reporting of these data, Starcorp failed to cooperate by not acting to the best of its ability."  Starcorp AFA Mem. at 30.

### 3.  Starcorp's Failure as to its Financial Statements

In antidumping proceedings Commerce's ability to confirm the accuracy and completeness of a respondent's submitted data largely rests on the existence of reliable financial statements and record keeping systems that accurately reflect the experience of the entity under review.  Starcorp AFA Mem. at 36.  Commerce's methodology for calculating normal value in a non-market economy focuses upon the quantity of inputs consumed in the production process, and, thus, Commerce must be able to confirm such consumption rates from the company's financial statements or recording system that accurately reflects the activity under review.  Id.  If Commerce is able to so confirm consumption rates, it will then be able to gain confidence in the overall integrity and reliability of a respondent's data.  Id.  Conversely, a financial system that lacks integrity cannot serve as the basis for confirming the accuracy of a respondent's submitted information.  Id.

Starcorp did not submit reliable financial statements, providing another basis for Commerce's decision that Starcorp failed to cooperate to the best of its ability and that an adverse inference was warranted in the calculation of Starcorp's dumping margin.

See Starcorp AFA Mem. at 30-37; Issues and Dec. Mem. at 190, 221.  Starcorp ultimately submitted some financial statements.  Starcorp AFA Mem. at 30.

Starcorp argues that Commerce should have relied on its combined financial statement because, among other things, its individual statements were constructed solely for tax purposes, whereas the combined statement purportedly "reflect[s] the reality of how Starcorp operates."  Starcorp Br. 20-21.  Starcorp also argues that because its financial statements were audited, Commerce should have considered them to be in accordance with Chinese GAAP.  Starcorp Br. 22-23.

Commerce considered and set forth in detail the record bases for its determination that, contrary to Starcorp's contentions, it had failed to submit reliable financial statements.  See Starcorp AFA Mem. at 30-37.  Commerce found that because Starcorp's submitted information could not be tied to any reliable financial statements or a reliable record-keeping system, the data submitted by Starcorp was not reliable.  Id. at 37.

Commerce also found that Starcorp's combined statement lacked the integrity normally acquired through an independent audit, and thus was not a reliable representation of Starcorp's normal operations.  Starcorp AFA Mem. at 31.  Commerce found, however, that the fact that the combined statement is only generated on an annual basis, not monthly or even quarterly, undercut any claim that it was of any use in daily operations.   Starcorp AFA Mem. at 30-31 & n.70; see Starcorp Supplemental Section A Resp. at 30 (Oct. 27, 2006), Confid. Doc. 216 frs. 36-37.  Finally, although the

combined statement was audited, Commerce was troubled by other factors involving the reliability of the financial statements.  Starcorp AFA Mem. at 31.[9]

Commerce had additional reasons to question the reliability of Starcorp's submitted financial statements.  See id. at 33.  Commerce found the inventory values reported in the combined financial statement to be suspect.  Id.; see Starcorp Verification Report (June 11, 2007), Confid. Doc. 408 fr. 16.  Commerce was anticipating Starcorp would demonstrate actual inventory values as required by Article 28 of Chinese GAAP.  Id.  Commerce, however, found Starcorp's financial statements to be inconsistent with these standards.  See Starcorp AFA Mem. at 33 ("Item II. Major accounting policies, assumptions and the methodology of preparing the combined financial statements, Sub item 4. Accounting Principles and Basis, states: "Valuation is based on the actual acquiring cost.").

Starcorp argues that Commerce erroneously interpreted Chinese GAAP, and that because Commerce is not an expert in Chinese GAAP, its findings should be discounted.  Starcorp Br. 22-23.  During verification, Commerce requested that Starcorp provide the relevant provisions of Chinese GAAP to demonstrate its compliance. Starcorp provided a translation of Article 28 of the Chinese GAAP to support its claim.

---

[9] The combined statement is "not required to meet any reporting requirements . . . and it does not represent the activities of Starcorp in any public domain as a consolidated financial statement.  Furthermore, in this case, where the financial statement is only used for internal management purposes, as Starcorp claims, it is likely that it will not undergo any government oversight or scrutiny.  As a result, [Commerce] finds that the combined financial statement lacks the integrity normally acquired through approval of an independent third party subject to jurisdictional oversight."  Starcorp AFA Mem. at 31.

See Starcorp Verification Report at 16.  Commerce, however, found nothing in the text

of GAAP Article 28 that would approve valuation other than "based on the actual

acquiring cost" as specified by Article 28, Item II of the Chinese GAAP.  See Starcorp

AFA Mem. at 33.

Although Starcorp does not appear to maintain that its individual financial

statements should be accepted, Commerce, nevertheless, examined those statements

and found that they too were unreliable because, among other things, they did not

comply with Chinese GAAP.  See Starcorp AFA Mem. at 34-36.

Under the circumstances, Commerce's finding that Starcorp failed to cooperate

to the best of its ability because its financial statements lacked reliability is reasonable

given the record as a whole.

### 4.  Other Failures in Starcorp's Submissions

In addition to the other enumerated deficiencies, Commerce found significant

discrepancies between the actual data Starcorp submitted, and the narrative

descriptions Starcorp provided to explain its data.  Final Results, 72 Fed. Reg. at

46,962; Starcorp AFA Mem. at 38-39.  For example, although Starcorp stated

repeatedly that it does not produce merchandise in sets, it reported quantities for sets.

Starcorp AFA Mem. at 39.  Starcorp also included the same products in the FOP

buildups for more than one CONNUM, when the products included in each CONNUM's

FOP buildup should be distinct.  Id. at 38; see Final Results, 72 Fed. Reg. at 46,962.

Finally, Commerce found inconsistencies in which products were reported using proxy

data.  Id.  Commerce determined that these additional, unexplained incongruities further

called the reliability of Starcorp's reported information into question, and supported

Commerce's belief that Starcorp had not provided forthcoming and accurate responses

to repeated requests for information, nor made a maximum effort to provide Commerce

with the information that it had requested.

The record does not support Starcorp's claims that it was unable to produce

information and that the discrepancies in information it belatedly produced are

excusable because it did not keep such information in the ordinary course but made

"extraordinary" efforts to comply with Commerce's requests.  Starcorp Br. 17-20.

As noted above and in Commerce's memorandum detailing its reasons for

applying an adverse inference, Commerce found Starcorp's claims that reporting

information in the manner requested would have been outside the normal course or

unduly burdensome to be unsubstantiated and at times contradicted by Starcorp's

actions.  See Starcorp AFA Mem. at 27-28.[10]  Commerce found that Starcorp's claims

also were at odds with its submission of data in a prior proceeding, and its requests for

two time extensions for the very purpose of providing such information (after which it still

insisted upon submitting combined data).  Id. at 17-18.  Consequently, Commerce

concluded that Starcorp's misstatements constituted the basis for Starcorp's failure to

---

[10]  "At verification, [Commerce] learned that Starcorp tracks its labor hours by production/function line, at each plant on a daily basis.  See Starcorp's November 29, 2006 response at page 14 where it states that 'Starcorp does not track standard or actual labor hours required to manufacture each product, but tracks, actual labor hours incurred everyday.'  While Starcorp tracks the hours manually, it had to compile these hours regardless of whether it was doing so on a company-wide or plant-specific basis.  Moreover, since it tracks the labor hours by production line at each plant, in compiling the combined data, it arguably would have had to first compile it by plant."  See Starcorp AFA Mem. at 27-28.

be forthcoming, and thus Commerce's finding that Starcorp did not cooperate to the best of its ability.  Starcorp AFA Mem. at 40.

In sum, Commerce determined that Starcorp misreported and withheld information regarding a sizable portion of its U.S. sales that would have served as the basis for Commerce's analysis and impacted Commerce's ability to calculate Starcorp's dumping margin.  Further, Commerce found that Starcorp failed to provide plant-specific information as Commerce requested, leading to a lack of reliable information regarding factor of production usage from Starcorp.  Commerce also determined that Starcorp's information could not be tied to reliable financial statements or reliable record-keeping system, and that the data manifested other significant discrepancies.  Based on these findings, Commerce concluded, objectively and subjectively, that Starcorp failed to cooperate by not acting to the best of its ability to comply with Commerce's requests for information.  Consequently, Commerce's decision to apply an adverse inference in calculating Starcorp's dumping margin was supported by the record evidence and is therefore reasonable.

### D. Selection of India as the Primary Surrogate Country

During the review Commerce selected India as the primary surrogate country. Dare Group asserts a substantial evidence challenge to Commerce's selection of India, arguing it was unreasonable because the difference in per capita Gross National Income ("GNI") between India and China purportedly shows that India is not economically comparable to China.  Dare Group Mem. in Support of Mot. J. Agency R. 4-19 ("Dare Group Br.").  They also raise a substantial evidence challenge to the

reliability of Indian data, arguing that Commerce's choice of India as the primary surrogate country is unreasonable because the data from India are not reliable, Dare Group Br. 14-18, and that better data are available from the Philippines, Dare Group Br. 19-21.

In a non-market economy proceeding Commerce values the factors of production "based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate." 19 U.S.C. § 1677b(c)(1). An "appropriate" market economy country is one "(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) [a] significant producer[] of comparable merchandise." 19 U.S.C. § 1677b(c)(4). Commerce employs a four-step process to select the primary surrogate country. First, Commerce compiles a list of countries that are at a level of economic development comparable to the country being investigated. Department of Commerce, Import Administration Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection Process at 2 (Mar. 1, 2004), available at http://ia.ita.doc.gov/policy/bull04-1.html. (last visited Aug. 10, 2009) ("Policy Bulletin"). Commerce then ascertains which, if any, of those cited countries produce comparable merchandise. Id. Next, from the resulting list of countries, Commerce determines, which, if any, of the countries are significant producers of comparable merchandise. Finally, Commerce evaluates the quality, e.g., the reliability and availability, of the data from those countries. Id. at 3. "Upon review of these criteria, Commerce chooses the country most appropriate for use as a surrogate for the [review]." Dorbest, 30 CIT at 1678-79, 462 F. Supp. 2d at 1270-71.

## 1. Economic Comparability

Early in the review Commerce selected what it believed to be five economically comparable countries for consideration as the surrogate country.  <u>See</u> Surrogate Country Selection Mem. (Jan. 22, 2007), Pub. Doc. 983 frs. 1-11 (citing <u>Policy Bulletin</u>).  To determine which countries were at comparable levels of economic development to China, Commerce evaluated per capita GNI pursuant to 19 C.F.R. § 351.408(b).  Rather than simply selecting countries closest to China in GNI, however, Commerce also considered which countries were likely to offer adequate data sources for valuing the factors of production (anticipating the subsequent steps in its selection process):

> When selecting the list of comparable countries in this case, [Commerce] first ranked the per capita 2004 GNI figures as reported in the World Bank's World Development Report 2006 (the latest version available at that point in the proceeding), disregarding countries designated as NMEs .. . and non-countries since neither would constitute appropriate surrogate countries.  From among the remaining group with similar levels of economic development to the PRC, [Commerce] selected five countries that have offered, in [Commerce]'s experience, the statistical sources and breadth of information that might make them suitable surrogate countries in the present proceeding.  It is these countries that [Commerce] first examined to see if any produced comparable merchandise in significant quantities and offered adequate data upon which to base the review.

Surrogate Country Selection Mem. at 8.

Commerce determined that India, Sri Lanka, Indonesia, Philippines, and Egypt were economically comparable to China.  <u>See</u> Memorandum from Ron Lorentzen, Director, Office of Policy, to Robert Bolling, Program Manager, AD/CVD Enforcement, Office 8 (Aug. 7, 2006) (listing Surrogate Countries), Pub. Doc. 501 fr. 2.  In responding

to parties' arguments that India's GNI (USD 620) was too disparate from China's (USD

1290) for India to be considered "economically comparable," Commerce explained:

> While the Department's regulations at 19 CFR 351.408 instruct the
> Department to consider per capita income when determining economic
> comparability, neither the statute nor the Department's regulations define
> the term "economic comparability." As such, the Department does not
> have a set range within which a country's GNI per capita could be
> considered economically comparable. In the context of the World
> Development Report, which contains approximately 180 countries and
> territories, the difference in GNI per capita between India and the PRC is
> minimal. As previously stated in the Surrogate Country Selection Memo,
> "while the difference between the PRC's USD1290 per capita GNI and
> India's USD620 per capita GNI in 2004 seems large in nominal terms,
> seen in the context of the spectrum of economic development across the
> world, the two countries are at a fairly similar stage of development." For
> example, in the World Development Report the four countries immediately
> higher than China in per capita GNI were Egypt (which was on the list of
> potential surrogate countries), Morocco, Columbia [sic], and Bosnia. Their
> per capita GNIs were higher than China's by USD20, USD230, USD710,
> and USD750, respectively. India's GNI per capita was only USD670 lower
> than China's. Therefore, the Department disagrees with the contention
> that India is no longer economically comparable to the PRC.
>
> Using this understanding of economic comparability, the Department
> currently formulates a nonexhaustive list in each proceeding of about five
> countries economically comparable to the NME country that, in the
> Department's experience, are most likely to offer data necessary to
> conduct the proceeding. In selecting the list of potential surrogate
> countries, the Department does not consider NMEs and non-state
> territories such as "West Bank/Gaza." The Department also did not include
> on its list ten countries which the Department believes would not have as
> much available and reliable data as India (i.e., Syria, Angola, Ivory Coast).
> Nevertheless, if parties suggest the consideration of another economically
> comparable country that did not appear on this initial list, the Department
> will also consider the appropriateness of using that country in its analysis.
> In this case, the country argued for by Respondents, the Philippines, was
> already included on the list and was considered equally with the other
> countries on the list including Indonesia, Sri Lanka, Egypt, and the chosen
> surrogate country, India.

Issues and Dec. Mem. at 23-29.  Although Commerce places primary emphasis on GNI when compiling its list of potential surrogate countries, it apparently does not set a fixed range into which a potential surrogate's per capita GNI must fall.  See id. at 27. Commerce explained that GNI is a broad indicator spanning over 180 countries and territories, and that "[a]n excessive focus on the exact ranking of each country on the list would only provide an illusion of precision and distort the appropriate purpose of using per capita GNI as the primary indicator, which is to give a general sense of the level of economic development of the country in question."  Surrogate Country Selection Mem. at 8.

Dare Group's substantial evidence challenge might be compelling if the standard for economic comparability (either by statute, regulation, administrative policy, or practice) depended on some fixed range of nominal GNI data, but as noted, it apparently does not.  Reviewed against the more flexible GNI standard actually applied by Commerce, Commerce's finding (and its accompanying explanation) that India is economically comparable to China is reasonable, and therefore supported by substantial evidence.

One final note about Dare Group's challenge to Commerce's finding of economic comparability.  During the administrative review Dare Group sought to utilize updated GNI information from a 2007 World Development Report that became available after Commerce had begun its surrogate country selection process, but before Commerce made its selection.  Commerce opted not to consider that information, concluding that it was issued too late for consideration in the surrogate country selection process.  In its

briefs in this action, Dare Group again relies upon information contained in the 2007 World Development Report in arguing that Commerce's economic comparability findings were unreasonable. Dare Group makes a bare assertion (without citation to any applicable statutory or regulatory provisions governing Commerce's treatment of record information) that: "the timing of the release of the World Development Report 2007 should not have been an issue . . . ," Dare Group Br. 11-12, and Commerce therefore should have considered that information.

Dare Group is asking the court to consider this information in its analysis of the issue when Commerce expressly declined to do so. Dare Group misunderstands the standard of review. When applying the substantial evidence standard of review, the court does not analyze or weigh evidence in the first instance; those actions reside within the agency's primary jurisdiction. Commerce specifically excluded the 2007 World Development Report from its economic comparability analysis. Given the current posture of the litigation, the court may, at most, review the more limited question of whether Commerce's refusal to consider the 2007 World Development Report data was reasonable (supported by substantial evidence) or in accordance with law. If not, then the appropriate remedy would be a remand to the agency to reconsider its comparability analysis with the benefit of the updated GNI data.

Dare Group, however, other than its bare assertion that Commerce had plenty of time to consider the 2007 World Development Report, makes no effort at identifying the standards governing Commerce's consideration of record information (e.g., statute, regulation, precedent, etc.) against which the court could review the reasonableness of

Commerce's action.    Dare Group did not therefore provide any developed argumentation why Commerce should have considered the 2007 World Development Report.   Thus, the court is not in a position to discuss this issue further.   Cf. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.   It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.") (internal citations omitted).

### 2. Commerce's Selection of Indian, Rather Than Philippine, Data Sources

Commerce selected India over the Philippines as the primary surrogate country for this review because Commerce determined that India provided the best available data valuing the respondent's factors of production.   Issues and Dec. Mem. at 34-37. Dare Group does not appear to contest Commerce's finding that Indian data provide greater coverage than Philippine data for valuing inputs specific to the production of wooden bedroom furniture.   Instead, Dare Group argues that Indian data are unreliable, citing reports alleging errors in the classifications and valuation of data from India.   Dare Group Br. 14-18.

Data considerations may be a determining factor for surrogate country selection. See Dorbest, 30 CIT at 1683-84, 462 F. Supp. 2d at 1274-75.   Commerce has relied upon country-wide, publicly-available Indian data in numerous reviews and investigations.   E.g., id.; Goldlink, 30 CIT at 618, 431 F. Supp. 2d at 1326.   In this review, because both India and the Philippines proved to be economically comparable

to China and significant producers of comparable merchandise, Commerce found data

availability and reliability to be the determining factor in its surrogate country selection.

See Surrogate Country Selection Mem. at 10.

Commerce needed to find factor values for several hundred inputs used in the

production of wooden bedroom furniture.  Issues and Dec. Mem. at 32 (for Dare Group,

161 factors were valued using India), 36 ("{n}ot including Starcorp, {Commerce} has

valued approximately 400 FOPs for the remaining four respondents.").  According to

Commerce, Indian data provided more comprehensive coverage of, and were more

specific to, the inputs used in the production of wooden bedroom furniture.  See

Surrogate Country Selection Mem. at 11.[11]  Because more input-specific data were

available from India, and because Philippine data were lacking for several inputs, such

as electricity and truck freight, Commerce concluded that India provided the best public

data for calculating an accurate normal value in this review.  Issues and Dec. Mem. at

37.  In sum, after comparing the data available from India and the Philippines,

Commerce found that India should be selected because the public data available for

---

[11] Commerce found that Indian data provided twice as many categories from which it
could value lumber inputs (which would be among the most significant inputs in a review
of wooden furniture), provided a contemporaneous HS data specific to mahogany
whereas no contemporaneous data was available from the Philippines, and covered
"significant FOPs such as birch lumber and pine lumber" that "are not available in the
Philippine HS data."  Surrogate Country Selection Mem. at 10-11; Issues and Decision
Mem. at 36 ("The HTS {Harmonized Tariff Schedule} numbers that Dare Group
submitted {from the Philippines} were . . . general basket categories, not specific to the
inputs at all: 4407.10.00 ('coniferous wood'), for pine, and 4407.99.00 ('other woods') for
birch . . . of the five Philippine HTS categories for lumber that may be applicable to this
review, three of them are broad basket categories. . . {where} there are five Indian HTS
categories specific to a particular type of wood . . . {applicable} to this review . . . .").

India provided a greater number of values for inputs specific to the wooden bedroom furniture factors of production that it needed to value in this review. <u>See</u> Surrogate Country Selection Mem. at 11; Issues and Dec. Mem. at 34-37.

Dare Group does not contest Commerce's finding that Indian data provided more specific input values, but rather cite several studies in an effort to impeach the reliability of the Indian data on a systemic level. Dare Group Br. 14-17.[12] Commerce examined these studies during the review, but found that they were not "sufficiently specific to the inputs in this case to qualify as evidence of inaccurate surrogate value data in this review." Issues and Dec. Mem. at 35. For example, Commerce found that the United States Trade Representative ("USTR") study references automotive parts and soybeans, inputs unrelated to furniture production. <u>Id.</u>; <u>see</u> Dare Group Surrogate Factor Data Submission Ex. 17 at 302-303 (Mar. 15, 2007), Pub. Doc. 1058 frs. 690-91. Similarly, Commerce found that the United Nations study only made general references to India in relation to misclassifications, unsupported by citation, and that the ARTNet study was not specific to any input in the administrative review. Issues and Dec. Mem. at 35; Dare Group Surrogate Factor Data Submission Ex. 13 at 20, Ex. 14 at 25, Ex. 15 at 56. These findings have support in the record.[13]

---

[12] Dare Group refers to studies alleging misclassification in various countries, including India, but did not specify any affected product category or the subject merchandise of wooden bedroom furniture.

[13] <u>See</u> note 6; <u>see also</u> Dare Group Factor Values Data Ex. 13 at 20 (discussion paper published by self-described "think tank" alleges problems with classification, supported by the following endnote: "Business Standard 25 August 2005"), Ex. 15 at 20 (references "private sector survey" of "problem areas" which include customs valuation, classification, documents, and technical and sanitary requirements), Ex. 14 at 25 (2006

Commerce examined specific input classification where distortion was alleged by Dare Group. See Issues and Dec. Mem. at 35 ("{o}f the 14 Indian surrogate values that Dare Group alleges are distorted, {Commerce} finds that there is credible evidence only to determine that three surrogate values were inaccurate."). Commerce made adjustments to these specific input values where it found evidence of distortions (plywood) or relied upon an alternative source where distortion or unreliability were demonstrated (mirrors). Id. at 35-36.

Commerce concluded that isolated incidents of distorted values did not render unreliable the entire Indian Harmonized Tariff Schedule ("HTS"). Id. Considering that Commerce needed to value approximately 400 inputs in this review, id. at 36, Commerce reasonably concluded that Indian HTS values did not suffer from extensive or systematic errors.

### E. Valuation of Market Economy Inputs

AFMC challenges Commerce's utilization of four market economy inputs pursuant to 19 C.F.R. § 351.408(c)(1). AFMC Mem. in Support of Mot. J. Agency R. 26-33 ("AFMC Br."). AFMC argues that Commerce failed to explain its methodology for ascertaining the valuation of these inputs and that Commerce did not examine whether the market economy inputs represented a "meaningful" percentage of the volume of factors being valued. AFMC Br. 26-33. AFMC, however, failed to raise these specific

working paper alleging "several under invoicing situations are possible", citing examples like apples, cameras and gum, i.e., not wooden bedroom furniture) (emphasis added), Ex. 17 at 302-303 (The USTR's annual report on international trade barriers notes that "U.S. exporters have reported that India's customs valuation methodologies do not reflect actual transaction values and effectively increase tariff rates," and discusses two products that are unrelated to this review: automotive parts and soybeans).

issues before Commerce, arguing instead that Commerce should simply apply retroactively a newly announced 33 percent threshold policy for market economy inputs. Petitioners' Case Brief at 30 (June 18, 2007), Non-Pub. .R. 416 fr. 41. That argument, in turn, is what Commerce addressed and rejected in the <u>Final Results</u>. Issues and Dec. Mem. at 52.

When reviewing Commerce's antidumping determinations, the Court of International Trade requires litigants to exhaust administrative remedies "where appropriate." 28 U.S.C. § 2637(d). "This form of non-jurisdictional exhaustion is generally appropriate in the antidumping context because it allows the agency to apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial review—advancing the twin purposes of protecting administrative agency authority and promoting judicial efficiency." <u>Carpenter Tech. Corp. v. United States</u>, 30 CIT 1373, 1374-75, 452 F. Supp. 2d 1344, 1346 (2006) (citing <u>Woodford v. Ngo</u>, 548 U.S. 81, 89 (2006)). By failing to raise the issues involving the four market economy inputs at the administrative level, AFMC deprived Commerce of the opportunity to make "findings, conclusions or determinations" for these issues. As a result, Commerce did not have the opportunity to "apply its expertise" or "compile a record adequate for judicial review." <u>Id.</u> AFMC therefore did not properly exhaust its administrative remedies for these issues.

### F. Jayabharatham's Financial Statements

Before the agency AFMC argued that Commerce should include Jayabharatham's financial statement in calculating surrogate financial ratios. Commerce did not agree:

> The Department has determined it is not appropriate to use Jayabharatham's 2005 - 2006 financial statement to calculate surrogate financial ratios for the final results. Although the website www.gnaol.com classifies Jayabharatham as a furniture manufacturer, other information on the record does not support this classification. First, a narrative description of the company taken from Jayabharatham's own website, http://www.jayabharathamfurniture.in/aboutus.htm, does not state that it is a manufacturer of any type of product and does not claim that it has any manufacturing facilities. Furthermore, Jayabharatham's profit and loss account lists purchases but does not specify whether it purchased material inputs that could be used in the manufacture of furniture or whether it purchased finished furniture. Moreover, the profit and loss account does not specify that any manufacturing expenses were incurred during the applicable period. Additionally, certain line item designations listed in the left column of Jayabharatham's fixed assets schedule, presumed to be titled "description of assets," are missing or are illegible. Thus, our analysis of Jayabharatham's business structure is impaired. Since the Department has determined that it will not rely on the 2005 - 2006 financial statement due to the concerns outlined above, Petitioners's argument that the Department should use the 2005 - 2006 financial statement to calculate surrogate ratios applicable to Jayabharatham's 2004 - 2005 fiscal year are not relevant. Therefore, we have not used Jayabharatham's financial statement in the calculation of our surrogate financial ratios.

Issues and Dec. Mem. at 95-96. AFMC raises a substantial evidence challenge to this decision, attacking its reasonableness.

When valuing the factors of production in a non-market economy context, Commerce employs financial statements from one or more surrogate companies to calculate comparable ratios for factory overhead, SG&A expenses and profit, so that Commerce can capture indirect expenses and profits not traceable to a specific product

or input.   19 U.S.C. § 1677b(c)(1), (3), (4); see <u>Dorbest,</u> 30 CIT at 1713-16, 462

F. Supp. 2d at 1300-01.   To serve as an adequate proxy for the respondent companies

being reviewed, the surrogate companies selected ideally should produce comparable

merchandise.   <u>See</u> 19 C.F.R. § 351.408(c)(4) ("For manufacturing overhead, general

expenses, and profit, [Commerce] normally will use . . . information gathered from

producers of identical or comparable merchandise."); <u>see also</u> 19 U.S.C. § 1677b(c)(1),

(4).   When an administrative review involves several viable surrogate companies,

Commerce averages the financial ratios for factory overhead, SG&A, and profit from the

financial statements.   Those averages then serve as surrogate values that are applied

to the respondents being reviewed in the non-market economy proceeding.   Issues and

Dec. Mem. at 86.

     When averaging multiple financial ratios from several statements, Commerce

generally finds that the greatest number of financial statements yields the most

representative data from the relevant manufacturing sector, and thus provides the most

accurate portrayal of the economic spectrum.   <u>Id.</u> at 86 (citing <u>Fresh Garlic From the</u>

<u>People's Republic of China: Final Results of Antidumping Duty New Shipper Review</u>,

67 Fed. Reg. 72,139 (Dep't Commerce Dec. 4, 2002) (final results new shipper review)

and accompanying issues and decisions memorandum).

     In the <u>Final Results</u> Commerce used 10 of the 19 statements submitted to

calculate the surrogate financial ratios.   Issues and Dec. Mem. at 86.   Given that

Commerce had 10 viable financial statements from which to derive the financial ratios,

Commerce was understandably reluctant to also include a suspect Jayabharatham

financial statement for a manufacturer that arguably did not manufacture comparable merchandise.  See Dorbest, 30 CIT at 1720, 462 F. Supp. 2d at 1304 ("Particularly problematic is the fact that other financial statements, without such problems, exist. Under such circumstances, Commerce must justify its decision to include statements which it admits are of questionable reliability and thereby unlikely to constitute the best available information.").

Commerce excluded Jayabharatham because Commerce found that its profit and loss statement, its fixed assets schedule, and the narrative on the company's website indicated that Jayabharatham did not manufacture comparable merchandise. Jayabharatham's profit and loss statement did not provide Commerce with confidence that Jayabharatham is a manufacturer or producer because it "does not specify that any manufacturing expenses were incurred during the applicable period."  Issues and Dec. Mem. at 95; AFMC Post-Preliminary Factor Submission Ex. 13 (Mar. 15, 2007), Pub. Doc. 1057 fr. 205.  Rather, the expenses listed in Jayabharatham's profit and loss statement (i.e., under "Expenditures"), appeared to Commerce to be administrative costs, rather than manufacturing costs.  Although Jayabharatham's profit and loss statement contains line items for "purchases," "administrative expenses," "selling & distribution," and "depreciation," there are no labor costs listed, nor is there a line item for "raw materials consumed" to indicate that Jayabharatham is consuming goods in manufacture.  See id. Ex. 13 at 205.  Further, because its profit and loss statement only lists "purchases," Commerce could not determine whether Jayabharatham's expenses

were "used in the manufacture of furniture or whether it purchased [and resold] finished furniture." Issues and Dec. Mem. at 95.

The lack of line items indicative of manufacturing in Jayabharatham's profit and loss statement contrasts with the companies that Commerce did select as surrogates, for which financial statements and website data indicated furniture manufacturing. Id. at 87 (Ahuja), 93-95 (Imperial Furniture). This contrast further justified Commerce's concern about Jayabharatham's status as a manufacturer of wooden furniture.

AFMC argues that because Jayabharatham's balance sheet refers to a loan "on all equipments, Plant & Machinery and other assets acquired by utilsing [sic] the loan," Commerce should have found Jayabharatham to be a producer. See AFMC Post-Preliminary Factor Submission at 206; AFMC Br. 35. Defendant persuasively counters that such a reference to machinery, without more, does not demonstrate that Jayabharatham produces furniture, "particularly when the totality of Jayabharatham's financial statements does not indicate furniture manufacturing to have occurred during the period." Def's. Resp. to Pls.' Mots. J. Agency R. 32. Moreover, contrary to AFMC's argument, Commerce's acceptance of Ahuja and Imperial Furniture as surrogates is not inconsistent with Jayabharatham's exclusion. Although both Ahuja's and Imperial's fixed asset schedules describe some assets other than those related to manufacturing, the fixed assets schedules for both companies also include at least some item descriptions consistent with the production of furniture. See AFMC Preliminary Factor Submission (Oct. 24, 2006), Pub. Doc. 610 fr. 122 (Ahuja), fr. 199 (Imperial Furniture).

Additionally, both Ahuja's and Imperial's profit and loss statements demonstrate they were engaged in manufacturing.  See id. at 124 (Ahuja), 204-05 (Imperial Furniture).

Finally, Commerce reasonably found that Jayabharatham's company website does not support a finding that it manufactures merchandise.  Issues and Dec. Mem. at 95; AFMC Post-Preliminary Factor Submission Ex. 13 at 216-18; AFMC Br. 34 ("The history of Jayabharatham Furniture began in 1937.  It was in this year that Thiru. Elumalai commenced designing and manufacturing of {sic} cane furniture . . . .").  The quote relied upon by AFMC only demonstrates that the founder of Jayabharatham began manufacturing cane furniture in 1937, it does not claim that Jayabharatham during the review period manufactured wooden furniture (i.e., comparable merchandise).  AFMC's other quotations from Jayabharatham's website also do not provide definitive support that Jayabharatham actually manufactures furniture:

> A dramatic change occurred in this period.  Wood became the most preferred material in the making for furniture.  It was a welcome change. With wood the whole process became advantageous.  Manufacture of furniture's {sic} could now be mechanized.  Mechanized production increased productivity.
>
> A relatively easier manufacturing process could now be put to use to mass produce furniture's {sic} that would cater to the needs and demands of Chennai's Population {sic} exquisitely {sic} designed furniture's {sic} were no longer out of the reach of the city's populace.

AFMC Post-Preliminary Factor Submission at 216-17; AFMC Br. 34.  These quotes only suggest that furniture is manufactured from wood not that Jayabharatham manufactured subject merchandise during the review period.  Accordingly, Commerce's finding that Jayabharatham's website "does not state that it is a manufacturer of any type of product and does not claim that it has any manufacturing facilities," is supported by record

evidence.  Issues and Dec. Mem. at 95.  For all of the foregoing reasons, Commerce's

decision not to use financial statements from Jayabharatham was reasonable.

### G. Calculation of Dare Group's Entered Value

Dare Group challenges Commerce's calculation of Dare Group's assessment

rate by not accepting its reported invoice prices for certain sales.  Dare Group Br. 27.

Additionally, for other sales, Dare Group argues that Commerce erred by refusing to

accept its reported values, which Dare Group claims are more accurate than

Commerce's calculation of entered value using its standard margin calculation program.

Dare Group Br. 27-28.

As is prescribed by Commerce's regulation, Commerce "normally will calculate

an assessment rate by dividing the dumping margin found on the subject merchandise

examined by the entered value of such merchandise for normal customs purposes . . . ."

19 C.F.R. § 351.212(b)(1).  Commerce's practice pursuant to this regulation is to use a

respondent's reported entered value to calculate an ad valorem assessment rate for

sales associated with a particular importer, where a respondent reports the actual

entered value for all sales associated with that importer.   Issues and Dec. Mem.

 at 133;  see Polyethylene Retail Carrier Bags from the People's Republic of China,

72 Fed. Reg. 51,588, 51,954 (Dep't Commerce Sept. 10, 2007) (prelim. results); Certain

Steel Concrete Reinforcing Bars from Turkey, 73 Fed. Reg. 24,535, 24,540 (Dep't

Commerce May 5, 2008) (prelim. results).  However, where the respondent does not

report the actual entered value for all sales associated with an importer and/or the

entered value is unknown, Commerce uses its standard margin calculation program to calculate a per-unit assessment rate for all sales associated with that importer.  Id.

Commerce found that Dare Group did not report the actual entered value for "all" of its sales and had instead reported commercial invoice or calculated estimates.  Id. Commerce did not accept reported invoice or estimated values because they were not the actual entered values submitted on customs forms.  Issues and Dec. Mem. at 133. Because Dare Group did not report the actual entered values for any of its sales, Commerce, consistent with its regulation and practice, utilized its standard margin calculation program.  Id.

Invoice values represent the reported purchase price of the subject merchandise or the fair market value, whereas, in contrast, the entered value is the invoice or commercial value less freight, insurance premium costs, and other applicable non-dutiable charges.  Koyo Seiko Co. v. United States, 24 CIT 364, 372, 110 F. Supp. 2d 934, 941 (2000), aff'd 258 F.3d 1340 (Fed. Cir. 2001).  In other words, the two values are not equal; the entered value is the adjusted commercial price.  Given that Commerce's regulation, 19 C.F.R. § 351.212(b), requires Commerce to use actual entered values for purposes of its assessment calculations, Commerce acted in accordance with the regulation by not accepting commercial invoice values in place of actual entered values.

Dare Group's claim that its method is more accurate is not the issue upon which Commerce's decision turned, rather it was the absence of actual entered value data.  In any event, Dare Group's claim does not appear to be supported by the record.  Dare

Group stated that it could not report within the time allotted because it did not maintain the requested information in a computerized database. <u>See</u> Dare Group's Supplemental Resp. (Jan. 22, 2007), Confid. Doc. 362 fr. 18. Dare Group's argument that Commerce should have accepted Dare Group's estimate would in effect hold Commerce to undertake the task that Dare Group itself declined to perform. It was Dare Group's burden in the first instance to comply with Commerce's request for information. Dare Group knew or should have known that, pursuant to 19 C.F.R. § 351.212(b), it would have to produce actual entered value data or Commerce would utilize its margin calculation program in the absence of such data.

Commerce's regulation and its practice require that it employ the actual entered value in order to calculate accurate assessment rates. 19 C.F.R. § 351.212(b). Commerce acted in accordance with its regulation when it did not accept either invoice values or other values derived by Dare Group, in place of actual entered values that Dare Group reported to U.S. Customs and Border Protection. <u>NSK Ltd. v. United States</u>, 27 CIT 56, 107-78, 245 F. Supp. 2d 1335, 1377 (2003) (citing <u>Koyo Seiko</u>, 24 CIT at 372-73, 110 F. Supp. 2d at 941-42 (2000) (finding that neither 19 U.S.C. § 1675(a) nor its legislative history provides an "unambiguously express intent" regarding the issue of whether Commerce could use entered value rather than sales value in its calculation of the assessment rate)).

## H. Zeroing

Starcorp and Dare Group challenge Commerce's practice of "zeroing" negative dumping margins when computing antidumping duties during an administrative review.

Starcorp Br. 36-46.  The issue of zeroing has been frequently litigated in this Court and the Federal Circuit; in each instance the courts have sustained the practice as a reasonable application of the antidumping statute under the second step of Chevron. SKF USA, Inc. v. United States, 537 F.3d 1373, 1382 (Fed. Cir. 2008); NSK Ltd. v. United States, 510 F.3d 1375, 1379-80 (Fed. Cir. 2007); Corus Staal BV v. United States, 502 F.3d 1370, 1375 (Fed. Cir. 2007); Corus Staal BV v. Dep't of Commerce, 395 F.3d 1343 (Fed. Cir. 2005) ("Corus Staal I"), cert. denied, 546 U.S. 1089 (2006); Timken Co. v. United States, 354 F.3d 1334 (Fed. Cir. 2004), cert. denied, 543 U.S. 976 (2004); Dorbest, 30 CIT at 1734-36, 462 F. Supp. 2d at 1315-17.

Commerce has ended the practice of zeroing for investigations, but continues the practice for administrative reviews.  The antidumping statute defines the term "dumping margin" as "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise."  19 U.S.C. § 1677(35)(A).  After Timken, for both investigations and reviews, Commerce interpreted the word "exceeds" to mean that only positive values fall within the definition of "dumping margin," and that only positive values are to be included in the computation of the "weighted average dumping margin" defined by 19 U.S.C. § 1677(35)(B).  Timken, 354 F.3d at 1341. Commerce, however, ended the practice of zeroing negative margins in antidumping investigations effective February 22, 2007.  Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation, 71 Fed. Reg. 77,722 (Dept. Commerce Dec. 27, 2006) (final modification) ("Final Modification")

(implementing <u>United States – Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing")</u>, WT/DS294/AB/R (WTO App. Body Apr. 18, 2006)).

Commerce though continues to zero negative margins for administrative reviews. In the <u>Final Results</u> and in response to Dare Group's and Starcorp's arguments that investigations and administrative reviews must be treated uniformly, Commerce explained that "outside the context of antidumping investigations involving average-to-average comparisons, [Commerce] interprets this statutory definition [§ 1677(35)(A)] to mean that a dumping margin exists only when normal value is greater than export or constructed export price." Issues and Dec. Mem. at 54. Commerce's justification for the disparate treatment now depends on the difference between investigations, in which Commerce calculates margins using average-to-average comparisons, 19 U.S.C. § 1677f-1(d)(1)(A), and administrative reviews, in which Commerce calculates margins on an entry-by-entry basis, 19 U.S.C. § 1675(a)(2)(A).

Dare Group and Starcorp argue that Commerce's new gap-filling position on zeroing violates the Federal Circuit's decision in <u>Corus Staal I</u>, which they believe requires § 1677(35) to be applied uniformly in both investigations and administrative reviews. Starcorp Br. 40. The court does not agree. In <u>Corus Staal I</u> the Federal Circuit upheld as a permissible construction of the statute Commerce's practice of zeroing in both investigations and reviews, notwithstanding arguments that investigations involve average-to-average comparisons and reviews involve entry-by-entry comparisons. <u>Corus Staal I</u>, 395 F.3d at 1347. The Federal Circuit upheld Commerce's uniform treatment of § 1677(35) for investigations and reviews not

because the statute required such treatment (<u>Chevron</u> step 1), but because it represented a permissible construction of the statute (<u>Chevron</u> step 2).  Although there is some irony in Commerce now adopting an interpretation of the statute that it previously rejected in the administrative proceedings underlying <u>Corus Staal I</u>, such irony alone does not make Commerce's new approach unlawful.  <u>Chevron</u> contemplates administrative flexibility in the interpretation of silent or ambiguous statutes; <u>Chevron</u> acknowledges that a statute like the antidumping law may contain more than one permissible construction on a particular issue.  Here, Commerce has not arbitrarily shifted its interpretation of the statute without reason.  It has, instead, exercised its gap-filling authority to conform the administration of the dumping laws with U.S. international obligations.  <u>Final Modification</u>, 71 Fed. Reg. 77,722.  That exercise has resulted in a permissible construction of the statute that does not violate <u>Corus Staal I</u>.  Accordingly, Commerce's practice of zeroing negative margins in the <u>Final Results</u> is sustained.

### III. Conclusion

Commerce's request for a voluntary remand regarding the treatment of combination rates is granted.  The court also remands to Commerce for reconsideration the issue of Commerce's selection of Starcorp's total AFA proxy.  The court sustains Commerce's determinations for all remaining issues contested in the motions for judgment on the agency record.  Accordingly, it is hereby

**ORDERED** that Defendant's request to remand this action to Commerce to reconsider its decision regarding combination rates is granted; it is further

**ORDERED** that this action is remanded to Commerce to reconsider its selection of a total AFA rate of 216.01 percent for Starcorp; it is further

**ORDERED** that the Motions for Judgment on the Agency Record are denied with respect to all other issues and that Commerce's determinations as to those other issues are sustained; it is further

**ORDERED** that Commerce is to file the remand results on or before October 7, 2009; and it is further

**ORDERED** that the parties file a proposed scheduling order with page limits for comments on the remand results, if applicable, not later than 14 days after Commerce files the remand results with the court.

/s/ Leo M. Gordon
Judge Leo M. Gordon

Dated:      August 10, 2009
            New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____          By: _____
                                                   Deputy Clerk